# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| DON GENTRY, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>LINNCO, LLC, LINN ENERGY, LLC, MARK E. ELLIS, KOLJA ROCKOV, DAVID B. ROTTINO, GEORGE A. ALCORN, DAVID D. DUNLAP, TERRENCE S. JACOBS, MICHAEL C. LINN, JOSEPH P. MCCOY, JEFFREY C. SWOVELAND, BARCLAYS CAPITAL INC., CITIGROUP GLOBAL MARKETS INC., RBC CAPITAL MARKETS, LLC, WELLS FARGO SECURITIES, LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, RAYMOND JAMES & ASSOCIATES, INC., UBS SECURITIES LLC, GOLDMAN, SACHS & CO., J.P. MORGAN SECURITIES LLC, ROBERT W. BAIRD & CO., INCORPORATED, BMO CAPITAL MARKETS CORP., CREDIT AGRICOLE SECURITIES (USA) INC., CIBC WORLD MARKETS CORP., HOWARD WEIL INCORPORATED, MITSUBISHI UFJ SECURITIES (USA), INC.<br><br>                    Defendants. | Civil Action No.: 4:13-cv-2014<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Don Gentry ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and

through his attorneys, which included, among other things, review and analysis of (a) regulatory filings made by LinnCo, LLC ("LNCO" or the "Company") and Linn Energy, LLC ("Linn"), with the United States Securities and Exchange Commission ("SEC"); (b) press releases and other public statements published and disseminated by LNCO and Linn; (c) transcripts of earnings calls conducted by officers of LNCO and Linn after the announcement of quarterly earnings; (d) media reports about LNCO and Linn and their management; and (e) review of other publicly available information concerning LNCO and Linn and their management. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired LNCO shares between October 12, 2012 and July 1, 2013, both dates inclusive (the "Class Period"), and/or who acquired LNCO shares pursuant or traceable to LNCO's false and misleading Registration Statement and Prospectus in connection with its October 12, 2012 initial public offering ("IPO"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 11 and 15 of the Securities Act of 1933 ("1933 Act"), and under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      LNCO is a Delaware limited liability company whose sole purpose is to own units representing limited liability company interests ("units") in Linn. Linn is an independent natural gas exploration and production company whose units trade on NASDAQ under the symbol "LINE."

3.      On October 12, 2012, LNCO filed its Prospectus for the IPO, which forms part of the Registration Statement that became effective on October 11, 2012.  Pursuant to the IPO, 34,787,500 shares of LNCO were sold at a price of $36.50 per share, raising approximately $1.2 billion in net proceeds for the Company after underwriting discounts, commissions, and fees. LNCO used the net proceeds from the IPO to acquire units in Linn equal to the number of shares sold in the IPO.

4.      As set forth in the Prospectus, LNCO has no significant operations or assets other than its ownership of units in Linn, and its cash flow consists exclusively of distributions from Linn. Accordingly, LNCO's ability to pay dividends to its shareholders is entirely dependent upon the ability of Linn to make distributions to its unitholders.

5.      However, as described further below, unbeknownst to LNCO investors at the time of the IPO, Linn had been overstating the cash flow available for distributions to its unitholders, and engaging in improper accounting practices, including without limitation, improperly accounting for its hedging strategies.

6.      On February 20, 2013, Linn and LNCO announced an agreement to merge with Berry Petroleum Company ("Berry") by issuing LNCO shares to Berry shareholders. Under the terms of the deal, Linn would then acquire the operating assets of Berry from LNCO in exchange for additional units of Linn.

7.      However, in two articles published in February 2013 (just prior to the announcement of the transaction with Berry) and in May 2013, *Barron's* questioned Linn's aggressive accounting practices. Among other things, *Barron's* criticized Linn for using non-GAAP accounting to mask considerable weakness in its distributable cash flows, thus calling into question the sustainability of its dividend.   Further, *Barron's* questioned Linn's accounting

for its derivative contracts by, for example, excluding the cost of its puts from its cash flow, while including the gains. As a result of these issues, in its May 2013 article, *Barron's* labeled Linn "the country's most overpriced large energy producer."

8.      Following the May 2013 *Barron's* article, Linn units declined 7%, to close at $35.75 per unit on May 6, 2013. In turn, LNCO shares dropped nearly 8% to close at $39.24 per share on May 6, 2013.

9.      On July 1, 2013, Linn and LNCO disclosed that the SEC had opened an informal inquiry into LNCO's proposed merger with Berry, as well as Linn and LNCO's hedging strategies and use of non-GAAP financial measures (the same accounting issues for which Linn and LNCO had been criticized by *Barron's*).

10.     On this news, Linn units declined $10.50 per unit, or 31.5%, within two trading sessions, to close at $22.79 per unit on July 3, 2013. In turn, LNCO shares dropped $10.12 per share, or 27.3%, within two trading sessions, to close at $26.95 per share on July 3, 2013.

11.     As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about LNCO's business and financial condition.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose to LNCO investors that: (1) Linn was overstating the cash flow available for distribution to Linn unitholders such as LNCO by, among other things, excluding the cost of certain hedging transactions from its calculation of adjusted EBITDA, and understating maintenance capital expenditures; (2) Linn's production from its oil and natural gas properties (as measured in million cubic feet equivalent per day ("MMcfe/d")) had flattened out and started decreasing, despite heavy capital expenditures; and (3) as a result of the foregoing, LNCO's financial statements were materially false and misleading at all relevant times.

4

12.     As a result of Defendants' false and/or misleading statements, LNCO shares traded at inflated prices during the Class Period. However, after disclosure of Defendants' false and/or misleading statements, LNCO's shares suffered a precipitous decline in the market value, thereby causing significant losses and damages to Plaintiff and other Class members.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act [15 U.S.C. §§77k and 77o], and §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act, and §27 of the Exchange Act.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because defendants maintain an office in this District, and many of the acts and omissions complained of herein occurred in substantial part in this District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

17.     Plaintiff, as set forth in the attached certification, purchased LNCO shares at artificially inflated prices during the Class Period and has been damaged thereby.

18.     Defendant LNCO is a Delaware limited liability company formed on April 30, 2012, under the Delaware Limited Liability Company Act. Its principal executive offices are

located at 600 Travis, Suite 5100, Houston, TX 77002.  LNCO's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "LNCO."

19.     Defendant Linn is a Delaware corporation, with its principal place of business located at 600 Travis, Suite 5100, Houston, TX 77002.  Linn's units trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "LINE."

20.     Defendant Mark E. Ellis ("Ellis") is, and was at all relevant times, the Chairman, President, and Chief Executive Officer of LNCO and Linn. Ellis signed the false and misleading Registration Statement.

21.     Defendant Kolja Rockov ("Rockov") is, and was at all relevant times, the Chief Financial Officer and Executive Vice President of LNCO and Linn. Rockov signed the false and misleading Registration Statement.

22.     Defendant David B. Rottino ("Rottino") is, and was at all relevant times, the Chief Accounting Officer and Senior Vice President at LNCO and Linn. Rottino signed the false and misleading Registration Statement.

23.     Defendant George A. Alcorn ("Alcorn") serves as a director of LNCO. Alcorn signed or authorized the signing of the false and misleading Registration Statement.

24.     Defendant David D. Dunlap ("Dunlap") served as a director of LNCO from at least August 2, 2012 to February 19, 2013 (when Dunlap resigned as a director of LNCO in connection with the proposed transaction with Berry). Dunlap signed or authorized the signing of the false and misleading Registration Statement.

25.     Defendant Terrence S. Jacobs ("Jacobs") serves as a director of LNCO. Jacobs signed or authorized the signing of the false and misleading Registration Statement.

26.     Defendant Michael C. Linn ("Mr. Linn") serves as a director of LNCO. Mr. Linn signed or authorized the signing of the false and misleading Registration Statement.

27.     Defendant Joseph P. McCoy ("McCoy") serves as a director of LNCO. McCoy signed or authorized the signing of the false and misleading Registration Statement.

28.     Defendant Jeffrey C. Swoveland ("Swoveland") served as a director of LNCO from at least August 2, 2012 until February 19, 2013 (when Swoveland resigned as a director of LNCO in connection with the proposed merger with Berry). Swoveland signed or authorized the signing of the false and misleading Registration Statement.

29.     The defendants named in ¶¶ 20-22 above are sometimes referred to herein as the "Officer Defendants."

30.     The defendants named in ¶¶ 23-28 above are sometimes referred to herein as the "Director Defendants," and are named as defendants solely for violations of the 1933 Act.

31.     Defendant Barclays Capital Inc. ("BCI") is a British-based global investment bank, and a division of Barclays PLC. BCI acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

32.     Defendant Citigroup Global Markets Inc. ("CGMI") is the brokerage and securities arm of Citigroup, Inc., and provides investment banking services to corporate, institutional, government, and retail clients. CGMI acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

33.     Defendant RBC Capital Markets, LLC ("RBC") is a Canadian-based global investment bank, and a part of Royal Bank of Canada. RBC acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

34.     Defendant Wells Fargo Securities, LLC ("WFS") is a provider of capital markets and investment banking services, and a division of Wells Fargo & Company. WFS acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

35.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a registered broker-dealer and investment adviser and a wholly-owned subsidiary of Bank of America Corporation. Merrill Lynch acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

36.     Defendant Credit Suisse Securities (USA) LLC ("CSS") provides investment banking services in the United States, and is a subsidiary of Credit Suisse (USA), Inc. CSS acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

37.     Defendant Raymond James & Associates, Inc. ("RJA") is a diversified financial services holding company engaged primarily in investment and financial planning, investment banking and asset management. RJA acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

38.     Defendant UBS Securities LLC ("UBS") is a leading global investment banking and securities firm, and one of the largest global asset managers. UBS acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

39.     Defendant Goldman, Sachs & Co. ("Goldman") is a full-service global investment banking and securities firm. Goldman acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

40.     Defendant J.P. Morgan Securities LLC ("JPM") is a leading financial services firm, and an affiliate of JPMorgan Chase Bank, N.A. JPM acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

41.     Defendant Robert W. Baird & Co. Incorporated ("Baird") is a wealth management, capital markets, asset management and private equity firm. Baird acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

42.     Defendant BMO Capital Markets Corp. ("BMO") is a leading, full-service North American financial services provider offering, among other services, equity and debt underwriting, and is a member of BMO Financial Group (formerly known as the Bank of Montreal). BMO acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

43.     Defendant Credit Agricole Securities (USA) Inc. ("CAS") is a full service institutional broker/dealer, and a U.S. non-bank subsidiary of the Credit Agricole CIB. CAS acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

44.     Defendant CIBC World Markets Corp. ("CIBC") is the investment banking subsidiary of the Canadian Imperial Bank of Commerce, and provides a variety of financial services, including investment banking advisory services. CIBC acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

45.     Defendant Howard Weil Incorporated ("Howard Weil") is an energy investment boutique that provides investment banking services, and is a part of Scotia Capital (USA) Inc., which, in turn, is owned by Toronto-based Scotiabank. Howard Weil acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

46.     Defendant Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") provides investment banking and brokerage products and services to institutional clients, and is a member of the Mitsubishi UFJ Financial Group, Inc., a global Japan-based financial services company.

Mitsubishi acted as an underwriter for LNCO's IPO, helping to draft and disseminate the offering documents.

47.     The defendants named in ¶¶ 31-46 above are sometimes referred to herein as the "Underwriter Defendants."

48.     Defendant LNCO and the Officer and Director Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement. The Underwriter Defendants drafted and disseminated the offering documents and were paid more than $45 million in connection therewith (not including an additional structuring fee equal to 0.375% of the gross proceeds of the IPO, up to a cap of $5,000,000, payable to BCI). The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

### Background

49.     As noted, the sole purpose of LNCO is to own units of Linn. Linn is one of the largest publicly-traded, U.S.-focused, independent oil and natural gas exploration companies, and is the largest publicly-traded upstream oil and natural gas company that is treated as a partnership for U.S. federal income tax purposes. Linn is focused on the development and acquisition of long-life oil and natural gas properties. Among its assets are oil and natural gas properties in the following operating regions: Mid-Continent, the Hugoton Basin, the Green River Basin, the Permian Basin, Michigan/Illinois, California, the Williston/Powder River Basin, and East Texas.

50.     Because Linn is treated as a partnership for tax purposes, it created LNCO to enhance Linn's ability to raise additional equity capital to execute on its acquisition and growth

strategy. Specifically, because LNCO is taxed as a corporation, it appeals to investors that would like to invest in a dividend-paying oil and natural gas exploration and production company such as Linn, but would not otherwise invest in Linn units due to various undesirable tax consequences and onerous tax reporting requirements that come with owning securities of an entity taxed as a partnership.

51.     As of March 31, 2013, LNCO owned approximately 15% of Linn's outstanding units. Because LNCO's sole asset is Linn units, its success is entirely dependent upon the operation and management of Linn, and its ability to pay dividends to its shareholders is entirely dependent upon the ability of Linn to make distributions to its unitholders. Reflecting this reality, all of LNCO's quarterly and annual financial reports since the IPO have included the equivalent quarterly and annual financial reports of Linn as an exhibit, which was incorporated by reference into the relevant LNCO report.

52.     LNCO shareholders have the right to vote on any matter submitted by Linn to a vote of its unitholders (including the annual election of the Linn board of directors) insofar as LNCO will vote the Linn units it holds in the same manner as its shareholders vote on those matters. However, LNCO shareholders do not have the right to elect the LNCO board of directors. Instead, Linn holds the sole voting share in LNCO with the right to elect the LNCO board of directors.

53.     LNCO has no employees, and has an agreement with Linn to provide it with all of its necessary services and support. LNCO's senior executives are identical to those of Linn, and until recently (due to the pending merger with Berry), its directors were also identical to those of Linn. LNCO's principal executive offices are at the same address as those of Linn.

**Defendants' Materially False and Misleading Statements**
**Made In Connection with the IPO and Issued During the Class Period**

54.     On or about October 2, 2012, LNCO and Linn filed with the SEC a Form S-1/A

Registration Statement (the "Registration Statement"), which would later be utilized for the IPO,

and which incorporated a prospectus to be used in connection with the offer and sale of LNCO

shares, and the deemed offer and sale of Linn units to be acquired by LNCO with the proceeds of

its IPO. The Registration Statement was negligently prepared and, as a result, contained untrue

statements of material facts or omitted to state other facts necessary to make the statements made

not misleading, and was not prepared in accordance with the rules and regulations governing its

preparation.

55.     On or about October 12, 2012, LNCO filed its Prospectus for the IPO, which

forms part of the Registration Statement that became effective on October 11, 2012. The

Registration Statement and Prospectus (collectively, the "Offering Documents") indicated that

"[o]n April 24, 2012, [Linn's] Board of Directors approved an increase in the quarterly cash

distribution from $0.69 per unit to $0.725 per unit with respect to the first quarter of 2012,

representing an increase of 5%," and that [o]n July 24, 2012, [Linn's] Board of Directors

declared a cash distribution of $0.725 per unit with respect to the second quarter of 2012."

Annualized to $2.90 per unit, the yield on Linn's units as of the date of the IPO was over 7%.

LNCO was thus positioned as a stock for investors seeking income, and value of its shares was

tied primarily to the likelihood that Linn would continue to pay substantial and increasing

distributions to its unitholders.

56.     With respect to Linn's capacity to pay distributions to unitholders, the Offering

Documents described "Adjusted EBITDA" as "a measure used by [Linn] management to

evaluate cash flow and Linn's ability to sustain or increase distributions." For the six months

ended June 30, 2012, the Offering Documents reported that Linn's "Adjusted EBITDA" was $621 million, up from $473 million for the six months ended June 30, 2011. However, while that Adjusted EBITDA number included realized gains on Linn's derivative contracts, there was no deduction for the cost of those contracts. As per the February 2013 article in *Barron's* cited above, Linn's failure to deduct the cost of financial derivatives from its realized gains on hedging activities in calculating Adjusted EBITDA overstated the cash flow available for distributions to Linn unitholders during the relevant reporting period.

57.     Finally, the Offering Documents painted a picture of substantially increasing production from Linn's oil and natural gas properties from 218 MMcfe/d in 2009, to 265 MMcfe/d in 2010, to 369 MMcfe/d in 2011. The Offering Documents further reported production of 550 MMcfe/d for the six months ended June 30, 2012, as compared to 335 MMcfe/d for the six months ended June 30, 2011.

58.     The LNCO IPO on October 12, 2012 was a major success for LNCO and the Underwriter Defendants. 34,787,500 shares of LNCO were sold at a price of $36.50 per share, raising approximately $1.2 billion in net proceeds for the Company after underwriting discounts, commissions, and fees, while the Underwriter Defendants received more than $45 million (not including an additional structuring fee equal to 0.375% of the gross proceeds of the IPO, up to a cap of $5,000,000, payable to BCI).

59.     On October 25, 2012, Linn issued a press release announcing financial results for the third quarter ended September 30, 2012. Among other things, the release stated that Linn had increased average daily production to 782 MMcfe/d during 3Q 2012, as compared to 379 MMcfe/d during 3Q 2011.

60.     During a conference call on October 25, 2012, to discuss Linn's 3Q 2012 results, Defendant Ellis stated that "current production" from Linn's oil and natural gas properties had increased from 425 MMcfe/d at the start of the year to "more than 800 MMcfe/d."

61.     On October 26, 2012, LNCO filed its Form 10-Q ("October 2012 Form 10-Q") for the period ended September 30, 2012. The October 2012 Form 10-Q was signed by Defendant Rottino, and contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, representing that the financial information contained in the Form 10-Q did not contain any untrue or misleading statements of a material fact, and fairly presented in all material respects the financial condition of LNCO for the relevant reporting period.

62.     The October 2012 Form 10-Q reported that, on October 23, 2012, Linn's Board had declared a cash distribution of $0.725 per unit with respect to Linn's third quarter of 2012, and that the cash dividend payable to LNCO shareholders, on account of LNCO's interest in Linn, would equal $0.71 per share (after deducting a small income tax reserve).

63.     Attached to the October 2012 Form 10-Q as an exhibit, and incorporated therein by reference, was the Form 10-Q filed by Linn for the third quarter ended September 30, 2012 ("Linn 3Q Form 10-Q"). The Linn 3Q Form 10-Q reported Adjusted EBITDA of over $1 billion for the nine months ended September 30, 2012, but once again, while this figure included realized gains on Linn's derivative contracts, the costs of such contracts was not deducted, thereby overstating the cash flow available for distributions to unitholders during the relevant reporting period.

64.     On February 15, 2013, Linn filed a presentation with the SEC addressing the question of how it accounted for its hedging activity. The presentation quoted Defendant Ellis as stating:

> Since our IPO, hedging our oil and natural gas production has always been an important strategy for the company and our investors. Our hedge strategy has served LINN and our investors well through a variety of commodity price cycles . . . Hedging will continue to be an integral part of LINN's strategy.

65.     The presentation further represented that Linn "is confident in the validity and accuracy of its audited financial statements," "generates sufficient cash flow to cover its distributions," and "considers the cost of puts as a 'capital' investment," and therefore, in Linn's opinion, properly excluded from Adjusted EBITDA in the same way that Adjusted EBITDA is not reduced by depreciation expense.

66.     On February 21, 2013, Linn, LNCO and Berry announced the signing of a definitive merger agreement pursuant to which Linn and LNCO agreed to acquire all of Berry's outstanding shares for total consideration of $4.3 billion, including the assumption of debt.

67.     Also on February 21, 2013, Linn issued a press release announcing financial results for the fourth quarter and full year ended December 31, 2012. Among other things, the release stated that Linn had "increased" average daily production to 800 MMcfe/d during 4Q 2012, as compared to 425 MMcfe/d during 4Q 2011. However, as compared to the "more than 800 MMcfe/d" cited by Defendant Ellis as "current production" during the 3Q 2012 conference call in October 2012, production had actually remained flat from the 3Q 2012 to 4Q 2012.

68.     During a conference call on February 21, 2013, to discuss the full year 2012 results, Defendant Ellis stated that "[t]he midpoint of guidance indicates average production of approximately 827 MMcfe/d for the first quarter of 2013," and "an average of 985 MMcfe/d for the full year 2013." During the same call, Defendant Rockov also projected that, as a result of

anticipated synergies from the merger with Berry, management would recommend to Linn's and LNCO's boards a 6.2% increase in Linn's distribution rate and an 8.5% increase in LNCO's dividend rate.

69.     On February 28, 2013, LNCO filed its Form 10-K ("February 2013 Form 10-K") for the period ended December 31, 2012. The February 2013 Form 10-K was signed by, among others, Defendants Ellis, Rockov, and Rottino, and contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, representing that the financial information contained in the Form 10-K did not contain any untrue or misleading statements of a material fact, and fairly presented in all material respects the financial condition of LNCO for the relevant reporting period.

70.     The February 2013 Form 10-K reported that, on January 24, 2013, Linn's Board had declared a cash distribution of $0.725 per unit with respect to Linn's fourth quarter of 2012, and that the cash dividend payable to LNCO shareholders, on account of LNCO's interest in Linn, was $0.71 per share (after deducting a small income tax reserve).

71.     Attached to the February 2013 Form 10-K as an exhibit, and incorporated therein by reference, was the Form 10-K filed by Linn for the fourth quarter and full year ended December 31, 2012 ("Linn 2012 Form 10-K"). The Linn 2012 Form 10-K reported Adjusted EBITDA of over $1.4 billion for the twelve months ended December 31, 2012, but once again, while this figure included realized gains on Linn's derivative contracts, the costs of such contracts was not deducted, thereby overstating the cash flow available for distributions to unitholders during the relevant reporting period.

72.     On April 25, 2013, Linn issued a press release announcing financial results for the first quarter ended March 31, 2013. Among other things, the release stated that Linn had "increased" average daily production to 796 MMcfe/d during 1Q 2013, as compared to 471 MMcfe/d during 1Q 2012. However, the production figure for 1Q 2013 represented (i) a decline from the 800 MMcfe/d during 4Q 2012, and the "more than 800 MMcfe/d" cited by Defendant Ellis as "current production" during the 3Q 2012 October 2012 conference call, and (ii) fell substantially short of the 827 MMcfe/d projected by Defendant Ellis for the first quarter of 2013 during the 4Q 2012/year end February 2013 conference call.

73.     On April 29, 2013, LNCO filed its Form 10-Q ("April 2013 Form 10-Q") for the period ended March 31, 2013. The April 2013 Form 10-Q was signed by Defendant Rottino, and contained signed certifications pursuant to SOX by Defendants Ellis and Rockov, representing that the financial information contained in the Form 10-Q did not contain any untrue or misleading statements of a material fact, and fairly presented in all material respects the financial condition of LNCO for the relevant reporting period.

74.     The April 2013 Form 10-Q reported that, on April 23, 2013, Linn's Board had declared a cash distribution of $0.725 per unit with respect to Linn's first quarter of 2013, and that the cash dividend payable to LNCO shareholders, on account of LNCO's interest in Linn, was $0.725 per share (due to the absence of any income tax reserve).

75.     Attached to the April 2013 Form 10-Q as an exhibit, and incorporated therein by reference, was the Form 10-Q filed by Linn for the first quarter ended March 31, 2013 ("Linn 1Q Form 10-Q"). The Linn 1Q Form 10-K reported Adjusted EBITDA of $356 million for the three months ended March 31, 2013, which was lower than the $379 million reported for 4Q 2012, and the $402 million reported for 3Q 2012. Once again, the Adjusted EBITDA figure included

realized gains on Linn's derivative contracts, but the costs of such contracts was not deducted, thereby overstating the cash flow available for distributions to unitholders during the relevant reporting period

76.     The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them, including that: (1) Linn was overstating the cash flow available for distribution to Linn unitholders such as LNCO by, among other things, excluding the cost of certain hedging transactions from its calculation of adjusted EBITDA, and understating maintenance capital expenditures; (2) Linn's production from its oil and natural gas properties (as measured in million cubic feet equivalent per day ("MMcfe/d")) had flattened out and started decreasing, despite heavy capital expenditures; and (3) as a result of the foregoing, LNCO's financial statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

77.     On February 16, 2013, *Barrons* published an article entitled "Drilling Into the Numbers." The article stated the following in relevant part:

> Linn (ticker: LINE) hedges all of its oil and natural-gas output with financial derivatives, the better to provide a steadily growing level of income to unit holders. The company pays an annualized distribution—the MLP equivalent of a dividend—of $2.90 per unit, which equates to a yield of 8%, based on its current share price of $36.

> That yield has attracted investors, but they could be overpaying. Linn's units trade for 10 times 2012 pretax cash flow, roughly double the valuation of energy exploration and production companies such as Apache (APA), Devon Energy (DVN), and Canada's Suncor Energy (SU), and in excess of valuations accorded smaller energy producers structured as MLPs.

> *Moreover, Linn may be overstating the cash flow available for distribution, by not deducting the cost of financial derivatives—mainly put options—from its realized gains on hedging activities in its quarterly results. Bears argue that funds invested in derivatives should be treated as an expense, and at least one of*

> *Linn's major competitors follows that approach. Linn says its energy derivatives are an integral part of its corporate strategy and amount to an asset, much like an oil and gas property. The value of such assets typically gets depreciated over their useful life.*

78.     Following the May 2013 *Barron's* article, Linn units declined 7%, to close at $35.75 per unit on May 6, 2013. In turn, LNCO shares dropped nearly 8% to close at $39.24 per share on May 6, 2013.

79.     On June 4, 2013, in connection with the proposed acquisition of Berry Petroleum, Linn filed a Form S-4/A that disclosed the following explanation of its mark-to-market (gains) losses on commodity derivatives and the cost of contracts on which gains or losses were realized during the relevant period:

> Represent changes in fair value of the derivative contracts from period to period and include the premiums associated with put option contracts over time. *Linn considers the cost of premiums paid for put options as an investment related to its underlying oil and natural gas properties only for the purpose of calculating the non-GAAP measures of adjusted EBITDA and DCF. The premiums paid for put options that settled during the three months ended March 31, 2013 and March 31, 2012 and during the years ended December 31, 2012, 2011 and 2010 were approximately $43 million, $26 million, $148 million, $88 million and $94 million, respectively.*

80.     Along with the above disclosure, Linn reconciled its calculation of Adjusted EBITDA with distributable cash flow (a metric used to determine how much cash is available to pay distributions to Linn unitholders by subtracting cash interest expense and maintenance capital expenditures back to EBITDA). The calculations revealed that, contrary to the impression that Linn had given earlier in the year, the impact of the cost of Linn's puts on the cash available for distributions was, and remains significant. For example, during the first quarter, the cost of puts that settled in that period was $43 million, or nearly 30% of the company's reported distributable cash flow of $150 million. Moreover, the calculations showed that Linn didn't cover its first-quarter distribution of 72.5 cents per unit out of distributable cash even before

factoring in the put cost, and that including the put cost, the coverage ratio was just 63%. Similarly, while for the full year ended December 31, 2012, Linn's distributable cash flow covered its distributions, when the $148 million in premiums paid for put options that settled in 2012 were factored in, distributions exceeded distributable cash flow by approximately $65 million.

81.     The disclosures in the June 4, 2013 Form S-4/A also validated the suspicions voiced in the May 2013 *Barron's* article concerning the amounts designated by Linn as "maintenance capital expenditures" in calculating distributable cash flow. As defined by Linn, "maintenance capital" is a non-GAAP forward-looking 12-month calculation of the amount of capital required to approximately hold production and reserves flat. However, as noted, beginning in the 4Q 2012, production from Linn's oil and natural gas properties flattened, and then decreased. Since the numbers used for "maintenance capital expenditures" in the June 4, 2013 Form S-4/A disclosure do not represent the total capital expenditures for the relevant periods, it appears that Linn understated "maintenance capital expenditures" in calculating distributable cash flow for those periods (and in fact, a greater percentage of the total capital expenditures were "maintenance capital expenditures," as argued in the *Barron's* article).

82.     On June 15, 2013, following the disclosure in the June 4, 2013 Form S-4/A, *Barrons* published a third article entitled "Linn Comes Clean on Derivative Costs."  The article stated the following in relevant part:

> A surprise disclosure from Linn Energy (ticker: LINE), buried in a recent regulatory filing related to its planned merger with Berry Petroleum (BRY), supports the view put forth in *Barron's* that the oil and natural-gas producer's distributable cash flow is overstated and doesn't cover its distributions to investors.
>
> One of the key controversies surrounding Linn, which is structured like a master limited partnership, is the accounting for its energy derivatives in its distributable

cash flow, a key financial measure for MLPs. ***Distributable cash flow (DCF) is the basis for Linn's distribution, the MLP equivalent of a dividend.*** Linn has a market value of $7.5 billion, plus $6 billion of debt.

Linn has realized above-market prices for its natural gas due to its use of derivatives, including in-the-money put options. This has allowed the company to get more than $5 per million British thermal units for its gas when the market price has been $4 or lower.

Linn argues that the put options amount to a capital investment, so their cost shouldn't be deducted from distributable cash flow. The company has leeway in computing DCF because the measure isn't governed by generally accepted accounting principles.

*Barron's* view is that Linn's accounting is aggressive, because the company wants to recognize the financial benefits of the puts, but not the costs ("Twilight of a Stock Market Darling," May 6). In its GAAP-compliant net income, it recognizes its derivative expense.

"It's the gain or loss from the derivative transaction that must be reflected in pre-tax accounting income, not merely the proceeds derived from the sale or disposition of the derivative," says New York tax expert Robert Willens. "I can't think of an accounting principle or theory that would permit recording only the proceeds from the derivative while ignoring the cost."

Accounting issues, plus a flattening in Linn's energy output and concerns that Linn's merger with Berry may get derailed, all have weighed on Linn units. They fell 8% last week to $31, down from $38 at the time of our May article. Based in part on analysis from Hedgeye Risk Management, an independent research firm, we argued that Linn units are worth no more than book value, or about $17 per unit. Support for Linn units comes from a 9% yield.

The Berry deal, which needs shareholder approval, is expected to close in the third quarter, later than originally forecast.

***Until the recent disclosure in a footnote on page 257 of a revised proxy for the deal, it wasn't possible to calculate the impact of the puts on Linn's distributable cash. And contrary to the impression the company has given this year in presentations aimed at thwarting short-sellers, that expense is significant. During the first quarter, the cost of puts that settled in that period was $43 million, or nearly 30% of the company's reported distributable cash flow of $150 million.***

***Linn didn't cover its first-quarter distribution of 72.5 cents per unit even before factoring in the put cost. Including the put cost, the coverage ratio was just 63%. Some investors have said Linn is covering its distribution by selling equity***

*and debt. The company disputes this, maintaining the funds come from free cash flow. Linn says it expects to fully cover its distribution for the full year.*

The drop in Linn units could imperil the Berry deal. Linn will pay for Berry with shares of LinnCo (LNCO), a corporation created by Linn that holds Linn units. LinnCo trades at $37, a six-point premium to Linn, but there is reason to believe the price of the less-liquid LinnCo shares will converge with the price of the Linn units, making the deal unattractive to Berry holders. LinnCo's current premium could reflect the difficulty of shorting the stock.

What's more, there could be adverse tax consequences from the Berry deal for LinnCo holders, starting in 2016. Hedgeye's Kevin Kaiser argues that LinnCo shares probably should trade at a discount to Linn units because of the tax liability. Linn cites an opinion from an independent financial advisor that found the Berry deal fair to LinnCo holders, "including the deferred tax liability."

Berry investors might want to think hard about approving the Linn merger, considering Linn's aggressive accounting and the potential tax hit. Linn units may be headed lower, and that could happen quickly if the Berry deal, considered important to Linn's financial outlook, collapses.

83. On July 1, 2013, Linn and LNCO disclosed that the Securities and Exchange Commission ("SEC") had open an informal inquiry into LNCO's proposed merger with Berry, as well as Linn and LNCO's hedging strategies and use of non-GAAP financial measures (the same accounting issues for which Linn and LNCO had been criticized by *Barron's*).

84. On this news, Linn units declined $10.50 per unit, or 31.5%, within two trading sessions, to close at $22.79 per unit on July 3, 2013. In turn, LNCO shares dropped $10.12 per share, or 27.3%, within two trading sessions, to close at $26.95 per share on July 3, 2013.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

85. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired LNCO shares during the Class Period and/or pursuant or traceable to the Company's false and misleading Registration Statement for its IPO, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of LNCO, members of the

Officer Defendants' and Director Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

86.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, LNCO units were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

87.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

88.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

89.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the 1933 Act and/or the Exchange Act were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, and prospects of LNCO;

- whether defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading

- whether the defendants caused LNCO to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of LNCO shares during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

90.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

91.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- LNCO shares met the requirements for listing, and were listed and actively traded on the NASDAQ Global Select Market, a highly efficient and automated market;

- As a public issuer, LNCO filed periodic public reports with the SEC and the NASDAQ;

- LNCO regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- LNCO was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

92.     Based on the foregoing, the market for LNCO shares promptly digested current information regarding LNCO from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### For Violation of §11 of the 1933 Act
### (Against All Defendants)

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except as set forth below in Paragraph 95.

94.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §§77k, on behalf of the Class, against all defendants.

95.     This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not allege that the Officer Defendants, the Director Defendants, or the Underwriter Defendants had scienter or fraudulent intent with respect to this Count, insofar as scienter or fraudulent intent are not elements of a §11 claim.

96.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements not misleading, and omitted to state material facts required to be stated therein.

97.     LNCO is the registrant for the IPO. The other defendants named herein were responsible for the contents and dissemination of the Registration Statement.

98.     As the issuer of the shares, LNCO is strictly liable to Plaintiff and the Class for any misstatements or omissions in the Registration Statement.

99.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, and/or without omissions of any material facts, were not misleading.

100.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

101.     Plaintiff acquired LNCO shares pursuant and/or traceable to the Registration Statement for the IPO.

102.     Plaintiff and the Class have sustained damages. The value of LNCO stock has declined substantially subsequent to and due to defendants' violations.

103.     At the time of their purchases of LNCO shares, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to July 1, 2013. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based, to the time that Plaintiff filed this complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public, and the time Plaintiff filed this complaint.

## COUNT II

### For Violation of §15 of the 1933 Act
### (Against LNCO, Linn, the Officer Defendants and the Director Defendants)

104.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except as set forth below in paragraph 106.

105.     This Count is brought pursuant to §15 of the 1933 Act against LNCO, Linn, the Officer Defendants, and the Director Defendants.

106.    This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not allege that the Officer Defendants or the Director Defendants had scienter or fraudulent intent with respect to this Count, insofar as scienter or fraudulent intent are not elements of a §15 claim.

107.    The Officer Defendants and the Director Defendants each were control persons of LNCO and Linn by virtue of their positions as a director and/or senior officer of LNCO and Linn. The Officer Defendants and the Director Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of LNCO and Linn. LNCO and Linn controlled the Officer Defendants, and the Director Defendants.

99.    Defendants each were culpable participants in the violations of §11 of the 1933 Act alleged in the prior Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## COUNT III

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### (Against LNCO, Linn and the Officer Defendants)

108.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

109.    This Count is asserted against LNCO, Linn and the Officer Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

110.    During the Class Period, LNCO, Linn and the Officer Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    LNCO, Linn and the Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of LNCO common stock during the Class Period.

112.    LNCO, Linn and the Officer Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of LNCO were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of LNCO and Linn, their control over, and/or receipt and/or modification of LNCO's and Linn's allegedly materially misleading statements, and/or their associations with the Company and Linn which made them privy to confidential proprietary information concerning LNCO and Linn, participated in the fraudulent scheme alleged herein.

28

113.   Officer Defendants, who are the senior officers of the Company and Linn, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other LNCO and Linn personnel to members of the investing public, including Plaintiff and the Class.

114.   As a result of the foregoing, the market price of LNCO and Linn common stock was artificially inflated during the Class Period. In ignorance of the falsity of LNCO's, Linn's and the Officer Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of LNCO securities during the Class Period in purchasing LNCO common stock at prices that were artificially inflated as a result of LNCO's, Linn's and the Officer Defendants' false and misleading statements.

115.   Had Plaintiff and the other members of the Class been aware that the market price of LNCO common stock had been artificially and falsely inflated by LNCO's, Linn's and the Officer Defendants' misleading statements and by the material adverse information which LNCO's, Linn's and the Officer Defendants did not disclose, they would not have purchased LNCO common stock at the artificially inflated prices that they did, or at all.

116.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

117.   By reason of the foregoing, LNCO, Linn and the Officer Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to

the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of LNCO common stock during the Class Period.

**COUNT IV**

**Violations of Section 20(a) of the Exchange Act**
**(Against the Officer Defendants)**

118.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119.    During the Class Period, the Officer Defendants participated in the operation and management of LNCO and Linn, and conducted and participated, directly and indirectly, in the conduct of LNCO's and Linn's business affairs.  Because of their senior positions, they knew the adverse non-public information about LNCO's and Linn's misstatement of income and expenses and false financial statements.

120.    As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to LNCO's and Linn's financial condition and results of operations, and to correct promptly any public statements issued by LNCO and Linn which had become materially false or misleading.

121.    Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings which LNCO and Linn disseminated in the marketplace during the Class Period concerning LNCO's and Linn's results of operations.  Throughout the Class Period, the Officer Defendants exercised their power and authority to cause LNCO and Linn to engage in the wrongful acts complained of herein. The Officer Defendants therefore, were "controlling persons" of LNCO and Linn within the meaning of Section 20(a) of the Exchange Act.  In this

capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of LNCO and Linn units.

122.    By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by LNCO and Linn.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 17, 2013

> **ABRAHAM, WATKINS, NICHOLS,**
> **SORRELS, AGOSTO & FRIEND**
>
> By: */s/ Sammy Ford IV*
> Sammy Ford IV
> Federal Bar Number: 950682
> Texas Bar Number: 24061331
> 800 Commerce Street
> Houston, TX 77002
> Telephone: 713-222-7211
> Facsimile: 713-225-0827

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

**WOHL & FRUCHTER LLP**
J. Elazar Fruchter
Ethan Wohl
570 Lexington Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
jfruchter@wohlfruchter.com
ewohl@wohlfruchter.com

***Attorneys for Plaintiff***